1

2

3

4

5

6

7

8

9          IN THE UNITED STATES DISTRICT COURT

10         FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12   IN RE TABLEWARE ANTITRUST              No   C-04-3514 VRW
     LITIGATION
13   _____/          ORDER

14   THIS DOCUMENT RELATES TO
     ALL ACTIONS
15   _____/

16

17         Plaintiffs in these consolidated cases allege that May

18   Department Stores Co ("May") and Federated Department Stores, Inc

19   ("Federated"), which operate department stores across the United

20   States, and Lenox, Inc ("Lenox") and Waterford Wedgwood, USA

21   ("Waterford"), both of which produce fine tableware sold in the

22   United States, conspired with one another to boycott Bed, Bath and

23   Beyond, a competitor of May and Federated.  Plaintiffs claim to

24   have purchased fine tableware from May and Federated during the

25   period of the alleged boycott and were thus injured because the

26   boycott impaired competition in that product market.  Plaintiffs

27   bring suit under § 1 of the Sherman Act, alleging that defendants'

28   conduct is condemned *per se*.

On November 17, 2006, Federated (joined by May) and Waterford moved for summary judgment asserting a variety of grounds.  Doc #116; Doc #128.  For reasons discussed below, the court GRANTS Waterford's motion for summary judgment and GRANTS IN PART and DENIES IN PART Federated's and May's motion for summary judgment.

I

In early 2000, both Waterford and Lenox considered expanding the distribution channels for their high-end tableware lines to include Bed, Bath & Beyond and other specialty retailers. Doc #183 at Ex 67 ("In a perfect world, this [Bed, Bath & Beyond partnership] is the kind of new distribution that we should be exploring; otherwise, we will be forever in the grip of the department stores.  However, we will have to assess the amount of angst at Federated compared with the prize before we decide whether or not to be a part of this [Bed, Bath & Beyond] test.").  See also Doc #180, Ex 10 (Mielke depo) at 48:8-51:15.

On March 7, 2001, Bed, Bath & Beyond and Waterford executives met and agreed to proceed with a test project.  Doc #180, Ex 10 (Mielke depo) at 74:12-75:9; Ex 32 ("A * * * meeting in New York when we agreed to proceed with the test * * *").  During subsequent meetings, Bed, Bath & Beyond and Waterford personnel finalized site plans for the opening of a fine china department at Bed, Bath & Beyond.  Doc #180, Ex 10 (Mielke depo) at 82:11-84:8; Doc #179, Ex 5 (Johnson depo) at 144:1-16; Doc #183, Ex 72.

Lenox also met with Bed, Bath & Beyond to discuss the prospect of distributing tableware.  Doc #179, Ex 2 (Gavin depo) at

50:19-53:6, 56:18-21, 58:15-24, 59:8-21; Ex 6 (Krangel Depo) at
94:8-98:23, 106:3-19; Doc #180, Ex 14 (Scala depo) at 68:5-70:11,
71:12-19.  Eventually, on March 30, 2001, Lenox agreed to
participate in a test rollout with Bed, Bath & Beyond.  Doc #179,
Ex 2 at 64:20-65:3; Doc #183, Ex 59 ("We will be piloting a 7 store
test program in Bridal tabletop products").  The parties confirmed
specific product assortments at subsequent meetings.  Doc #179, Ex
2 at 139:20-142:2; Doc #180, Ex 15 (Temares depo) at 59:9-63:22,
160:2-161:3; Doc #179, Ex 5 (Johnson depo) at 73:20-74:9,
198:18-199:9.

Because Waterford had an interest in knowing the
identities of the other manufacturers participating in the Bed,
Bath & Beyond rollout, its executives had their "ear to the ground
from day one about which manufacturers were going to be
participating and who were not going to be participating."  Doc
#179, Ex 10 (Mielke depo) at 156:8-14.  Indeed, Waterford's Mielke
testified that he probably mentioned the Bed, Bath & Beyond rollout
during conversations with Lou Scala and Moira Gavin at Lennox.  Doc
#179, Ex 2 (Gavin depo) at 139:20-141:9); Doc #180, Ex 10 (Mielke
depo) at 153:24-157:7; Ex 60 ("Lenox and Waterford are anchoring
the department.").

On May 31, 2001, Lenox informed May about its plans to
distribute through Bed, Bath and Beyond "as a '6 door test,'
starting in 9/01," Doc #182, Ex 44 at May 65281.  Lenox further
mentioned that Waterford would also be participating in the Bed,
Bath & Beyond rollout.  Doc #179, Ex 7 (Locraft depo) at 179:13-16.
The evidence suggests that this news spurred the retailers into
action.  Gregory Locraft, an executive at May, was "agitated,

3

United States District Court
For the Northern District of California

disappointed, concerned [and] upset" by this news.  In a raised voice, Locraft exclaimed "you do what you have to do and we'll do what we have to do."  Doc #179, Ex 7 at 176:14-16.  Soon thereafter, May executive Don Engelman called Carl Mielke at Waterford to confirm whether Waterford intended to participate in the Bed, Bath & Beyond rollout.  Mielke told Engelman that Waterford was "working on something" with Bed, Bath & Beyond.  Doc #180, Ex 10 at 163:11-12.

The next day, Lenox contacted May executive Judith Hofer "to try to take care of the situation" and "settle things down."  Doc #179, Ex 6 at 206:16-25.  Hofer was "very professional" in response, but reiterated Locraft's admonition, "you have to do what you need to do to grow your business and we need to do what we need to do."  Id at 209:7-9.

About a week after the May 31 meeting, Federated contacted both Lenox and Waterford to complain about their participation in the rollout.  Federated's Salus telephoned Lenox President Krangel and said he was "concerned" about the decision.  Doc #179, Ex 6 (Krangel depo) at 241:9-10.  At the end of the conversation, Salus told Krangel:  "[y]ou have to do what you have to do to grow your business and we have to do what we need to do with our business."  Doc #170, Ex 6 (Krangel depo) at 239:16-25, 236:19-244:17; Doc #180, Ex 14 (Scala depo) at 148:5-149:19, 151:3-12.

On the same day, Federated president Terry Lundgren and executive Janet Grove telephoned Waterford CEO Chris McGillivary about the Bed, Bath & Beyond program, warning that it "was not going to help the relationship between the two companies."  Doc

4

**United States District Court**
For the Northern District of California

#179, Ex 9 (McGillivary depo) at 65:5-66:11.  A few days later,
James Zimmerman, Federated's CEO, telephoned Anthony O'Reilly,
Chairman of Waterford, to discuss Waterford's participation in the
Bed, Bath & Beyond rollout.  According to Waterford, Zimmerman said
he "would advise against it."  Doc #180, Ex 19 at FED 001223; Ex 16
(Zimmerman depo) at 24:4-26:6, 29:4-30:3.

On June 12, 2001, Federated executives held an internal
meeting during which the Bed, Bath & Beyond rollout was mentioned.
Doc #179, Ex 3 (Grove depo) at 129:13-130:14.  One week later,
Helaine Suval, a vice-president at Federated, sent an email
summarizing the meeting as relayed to her from Federated's Dawn
Robertson (Suval did not attend the meeting).  The email states in
pertinent part:

> Waterford, Lenox and All-Clad have agreed to sell
> Bed, Bath & Beyond (6 stores).  Major point of
> contention – [Federated's president] Terry Lundgren
> involved.  Federated has threatened to drop them if
> they go ahead and sell BB&B.  No new initiatives
> with them in stores[.]

Doc #181, Ex 38.  Robertson disputes the accuracy of the Suval
email; although unable to recall what was said at the meeting,
Robertson firmly relates what was not said.  She contends that
nobody at the meeting "stated that Lenox or Waterford, or any of
their products, would be dropped by Federated or any of its stores,
nor did any Federated [employee] at the meeting state that there
would be no new initiatives with Lenox."  Doc #131, Ex T, ¶ 4.  The
point, of course, is that the evidence discloses conflicting
versions of events, albeit both from Federated personnel.

Around June 12, 2002, May executive Tom Hayes had a
meeting with Scala at Lenox, the substance of which Hayes relayed

to Gregory Locraft.  Doc #179, Ex 7 at 215:20-23.  According to Locraft's notes, Hayes maintained that he would not distribute several Lenox and Gorham brands if Lenox sold to Bed, Bath & Beyond.  Doc #179, Ex 7 at 218:17-21; Doc #183, Ex 57.

The concerns of Federated and May appear to have borne fruit.  Waterford's McGillivary told his subordinate, Carl Mielke, "[t]his is bad * * *, [w]e need to stop the test."  Doc #180, Ex 10 (Mielke depo) at 113:5-18.  McGillivary remarked to Mielke "[w]e needed to find a way to stop this and we need to tell [Bed, Bath & Beyond] we can't do this test, and we can't tell them that it is because of Federated."  Doc #180, Ex 10 (Mielke depo) at 111:21-113:25, 115:22-116:10.  Accordingly, Mielke drafted a script of what to tell Bed, Bath & Beyond, which McGillivary approved.  Doc #181, Ex 10 at 119:20-120:5, 130:22-131:7; Doc #181, Ex 31-33.

On June 12, 2001, Mielke called James Peikon and Todd Johnson at Bed, Bath & Beyond and told them Waterford would not be able to participate in the test program.  Doc #179, Ex 5 (Johnson depo) at 78:3-79:18; Doc #180, Ex 10 (Mielke depo) at 120:6-15, 130:22-134:21.  According to Mielke, Peikon and Johnson told Mielke that his reasons were "bullshit," Doc #180, Ex 10 at 133:3-25, and that "[t]hese F---- up department stores will promise you guys anything if you don't sell us but will go right back to F---- you up the --- like they always have."  Doc #181, Ex 32.

At McGillivary's instruction, Mielke reported his conversation with Bed, Bath & Beyond to Federated's Janet Grove.  Doc #180, Ex 10 (Mielke depo) at 134:22-136:18; Doc #181, Ex 31.  According to Mielke, Grove said "[t]hat's great[,] [y]ou guys do what you have to do and we do what we have to do, but I'm glad you

guys made this decision."  Doc #180, Ex 10 (Mielke depo) at 136:19-137:17; Doc #179, Ex 3 (Grove depo) at 83:7-18.

Next, Lenox called Bed, Bath & Beyond and terminated its participation in the Bed, Bath & Beyond program.  Doc #180, Ex 15 (Temares depo) at 168:5-169:22.  Lenox's Krangel called Bed, Bath & Beyond President and CEO Steven Temares and told him that Lenox needed to "pull back."  Doc #180, Ex 15 (Temares depo) at 95:13-96:4, 99:15-101:14, 103:16-107:22, 109:16-110:15, 168:5-170:16).  Temares thought Krangel's purported justification for pulling out of the deal "was a bunch of horse shit," sounded "scripted" and made no sense.  Doc #180, Ex 15 at 111:8-112:16, 170:17-171:7:

> It is just inconsistent with common sense since I sat with them at a meeting a month before, that I imagine people told him all along where we were in the process, that we had selected the assortment, that they approved the fixturing, that we had gone through with the selection of stores, that we involved all these people and time and effort and we had numerous meetings at all different levels in the organization, so common sense would indicate that what he said is farfetched.

Id, Ex 15 at 170:17-172:17.

Finally, on June 18, 2001, Federated's Zimmerman wrote to O'Reilly at Waterford, praising him for making the "right decision":

> I wanted to write and tell you I think your team made the right decision.  You have a great brand and it needs to be protected and enhanced.  I assume you played a role and I think you did the right thing for all partners in this game.  Thanks for listening to me as I voiced my thoughts.

Doc #180, Ex 18; Ex 16 (Zimmerman depo) at 26:13-20, 28:1-29:1.

//

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

About one year later, Waterford began to sell its Wedgwood tableware products to Bed, Bath & Beyond in August 2002 and its Waterford brand products in November 2004.  Lenox followed suit in November 2002.  Doc #179, Ex 2 (Gavin depo) at 221:12-221:21, 231:2-21, 243:21-244:9; Doc #183, Ex 62; Doc #183, Ex 67 at 29.

II

In its order denying defendants' motion to dismiss, the court remarked that plaintiffs "appear to state claims (presumably in the alternative) for (1) vertical minimum resale price maintenance, (2) horizontal price fixing and (3) an exclusionary group boycott."  Doc #52 at 5.  Since that time, plaintiffs have shed the first two theories of relief, rendering this suit, in plaintiffs' words, "a group boycott case."  Doc #161 at 8.

As a legal matter, however, this case is better characterized as <u>three</u> group boycott cases:  in plaintiffs' view, the successful boycott of Bed, Bath & Beyond arose from (1) a horizontal agreement between Federated and May, (2) a horizontal agreement between Waterford and Lenox and (3) vertical agreements among all defendants.  Moreover, plaintiffs presumably regard each set of agreements as independently sufficient to effect the boycott of Bed, Bath & Beyond.  Although plaintiffs add these alleged agreements together to arrive at one grand (and overdetermined) conspiracy, various antitrust doctrines impel the court to distinguish among these three categories at various points along the court's analysis.

//

8

United States District Court

For the Northern District of California

In reviewing a summary judgment motion, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the party opposing the motion. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v Liberty Lobby, 477 US 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. And the burden of establishing the absence of a genuine issue of material fact lies with the moving party. Celotex Corp v Catrett, 477 US 317, 322-23 (1986). When the moving party has the burden of proof on an issue, the party's showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. Calderone v United States, 799 F2d 254, 258-59 (6th Cir 1986). Summary judgment is granted only if the moving party is entitled to judgment as a matter of law. FRCP 56(c).

The nonmoving party may not simply rely on the pleadings, however, but must produce significant probative evidence supporting its claim that a genuine issue of material fact exists. TW Elec Serv v Pacific Elec Contractors Ass'n, 809 F2d 626, 630 (9th Cir 1987). The evidence presented by the nonmoving party "is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 US at 255. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id at 249.

United States District Court
For the Northern District of California

III

A

Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue * * * ."  15 USC § 15(a).  Although this language could be read to afford relief to all persons whose injuries are causally related to an antitrust violation, <u>Lucas v Bechtel Corp</u>, 800 F2d 839, 843 (9th Cir 1986), the doctrine of "antitrust standing" precludes such an interpretation.  <u>Los Angeles Memorial Coliseum Comm'n v NFL</u>, 791 F2d 1356, 1363 (9th Cir 1986).  "Only those who meet the requirements for 'antitrust standing' may pursue a claim * * *; and to acquire 'antitrust standing,' a plaintiff must adequately allege and eventually prove 'antitrust injury.'"  <u>Glen Holly Entertainment, Inc v Tektronix Inc</u>, 352 F3d 367 (9th Cir 2003) (citing <u>Associated Fed Contractors of California, Inc v California State Council of Carpenters</u>, 459 US 519, 530-35 (1983)).

To determine whether plaintiffs have standing to pursue their antitrust claim, the court considers five factors:

(1)    the nature of plaintiffs' alleged injury -- whether it was the type the antitrust laws were intended to forestall;

(2)    the directness of the injury;

(3)    the speculative measure of the harm;

(4)    the risk of duplicative recovery; and

(5)    the complexity in apportioning damages.

<u>Associated General Contractors</u>, 459 US at 538-45;

To conclude that there is antitrust standing, the court need not find in favor of plaintiffs on each factor, see <u>Amarel v</u>

10

United States District Court

For the Northern District of California

Connell, 102 F3d 1494, 1507 (9th Cir 1996); generally, "no single factor is decisive." R C Dick Geothermal Corp v Thermogenics, Inc, 890 F2d 139, 146 (9th Cir 1989) (en banc). Yet courts give great weight to the nature of plaintiffs' alleged injury. See Amarel, 102 F3d at 1507. Indeed, the Supreme Court has noted that "[a] showing of antitrust injury is necessary, but not always sufficient, to establish standing." Cargill, Inc v Monfort of Colorado, Inc, 479 US 104, 110 n5 (1986). To demonstrate an antitrust injury, it is not enough that the plaintiffs' claimed injury flows from the unlawful conduct; an antitrust injury must "flow[] from that which makes defendants' acts unlawful." Atlantic Richfield Co v USA Petroleum Co, 495 US 328, 334 (1990) (quoting Brunswick Corp v Pueblo Bowl-O-Mat, Inc, 429 US 477, 489 (1977)).

Plaintiffs principally rely on Blue Shield v McCready, 457 US 465 (1982), in asserting their injury was the type the antitrust laws were intended to forestall. In McCready, the Supreme Court held that an individual had standing to sue her health insurer for reimbursement of payments to a clinical psychologist for allegedly conspiring with physicians to bar clinical psychologists from the market by excluding their services from coverage under the insurance policy. In doing so, the Court rejected the argument that the plaintiff lacked standing because she was not an actor in the relevant market and because the more appropriate plaintiffs were the psychologists. Id. The Court reasoned that antitrust remedies "cannot be restricted to those competitors whom the conspirators hope to eliminate from the market. * * * As a consumer of psychotherapy services * * * [the plaintiff] was within that area of the economy * * * endangered by

[the] breakdown of competitive conditions."  Id at 479-80.  Even though the plaintiff "was not a competitor of the conspirators, the injury she suffered was inextricably intertwined with the injury the conspirator sought to inflict on psychologists and the psychotherapy market."  Id at 483.

Like the plaintiff in McCready, plaintiffs here are consumers in the restrained market – the tableware market.  And by purchasing tableware directly from the alleged co-conspirators, plaintiffs participated in the area of the economy endangered by anticompetitive conditions.  See id at 480.  See also Glen Holly Entertainment, 352 F3d at 372 (noting that "the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market") (citing Eagle v Star-Kist Foods, Inc, 812 F2d 538 (9th Cir 1987).  Accordingly, under McCready, although plaintiffs were not the direct target of defendants' boycott, their injuries were "inextricably intertwined with the injury the conspirators sought to inflict" on Bed, Bath & Beyond.  See McCready, 457 US at 483.

The second factor assesses whether plaintiffs' asserted injuries were the direct result of defendants' allegedly anticompetitive conduct.  Plaintiffs contend that defendants increased the price of its tableware by boycotting expansion to Bed, Bath & Beyond.  To assess the directness of this injury, courts look to the chain of causation linking plaintiffs' injury to the alleged restraint in the market.  See Associated General, 459 US at 540; Yellow Pages Cost Consultants, Inc v GTE Directories Corp, 951 F2d 1158, 1162 (9th Cir 1991) ("Directness in the antitrust context means close in the chain of causation.").  The

12

United States District Court
For the Northern District of California

chain of causation vis-à-vis Federated and May is direct because the boycott of Bed, Bath & Beyond allegedly affected the price plaintiffs paid Federated and May for Lenox and Waterford tableware.  See <u>Glen Holly</u>, 352 F3d at 374 (antitrust injury flowed from discontinuation of a competing product).  The chain of causation with respect to Waterford and Lenox, however, is more attenuated and, for reasons discussed below, implicates the so-called "direct purchaser" requirement.

Under the third factor, courts consider whether plaintiffs' damages are speculative.  See <u>Associated General</u>, 459 US at 542.  In <u>Associated General</u>, the Supreme Court found the damages claim in question to be speculative because (1) the alleged injury was indirect; and (2) "the alleged effects * * * may have been produced by independent factors."  Id; see also <u>Eagle v Star-Kist Foods, Inc</u>, 812 F2d 538, 542 (9th Cir 1987).

The court finds that plaintiffs' alleged damages are not speculative enough to eviscerate plaintiffs' standing.  First, as discussed above, plaintiffs' asserted injury flows directly from defendants' alleged decision to boycott Bed, Bath & Beyond.  Second, defendants do not suggest that plaintiffs' asserted injury may have stemmed from other exogenous market factors.  Third, although the extent of plaintiffs' damages hinges on a complex counterfactual (the price of tableware if Bed, Bath & Beyond had participated in the market), "this complexity is not so unusual as to distinguish this case from other complex business disputes * * *."  <u>American Ad Management, Inc v GTE Corp</u>, 190 F3d 1051, 1059 (9th Cir 1999).  See also <u>Forsyth v Humana, Inc</u>, 114 F3d 1467, 1478 (9th Cir 1997) ("Complex antitrust cases * * * invariably involve

**United States District Court**

For the Northern District of California

complicated questions of causation and damages.").

The fourth factor — the risk of duplicative recovery — also weighs in favor of plaintiffs' standing.  The purpose undergirding this factor is to avoid the risk "that potential plaintiffs may be in a 'position to assert conflicting claims to a common fund * * * thereby creating the danger of multiple liability for the fund.'"  Eagle, 812 F2d at 542 (quoting Associated General, 459 US at 544).  Even if Bed, Bath & Beyond could bring suit against defendants (it appears the statute of limitations has run, see 15 USC § 15(b)), duplicative recovery is unlikely because plaintiffs' damages are distinct from Bed, Bath & Beyond's.  To the extent defendants' alleged tactics raised artificially the price for tableware, plaintiffs' damages exceed — and thus diverge from — Bed, Bath & Beyond's lost profits.  See American Ad, 190 F3d at 1059-60 (damages related to lost profits are distinct from those related to increased costs).

As discussed above with respect to the speculative measure of harm factor, the court does not find the apportionment of damages in this case to be exceedingly complicated.  Furthermore, unlike Associated General, in which damages needed to be apportioned among "directly victimized contractors and subcontractors and indirectly affected employees and union entities," 459 US at 545, apportioning damages in this case would require only a determination of the damages suffered by direct customers.

In sum, because all five of the Associated General factors weigh in plaintiffs' favor, the court finds that plaintiffs have antitrust standing in this litigation, at least with respect

14

United States District Court
For the Northern District of California

to Federated and May.

One issue involving standing remains:  inasmuch as plaintiffs' suit targets an alleged horizontal agreement between Waterford and Lennox, plaintiffs run afoul of the so-called "direct purchaser" requirement from <u>Illinois Brick Co v Illinois</u>, 431 US 720 (1977).  The Court in <u>Illinois Brick</u> ruled that a plaintiff does not state a claim for relief for an illegal overcharge due to an anticompetitive agreement if the plaintiff did not purchase directly from a member of the conspiracy.  In doing so, the Court precluded antitrust claims based on overcharges that were "passed-on" through the distribution chain to the ultimate consumer.  Id.

<u>Illinois Brick</u> does not preclude this suit entirely because plaintiffs purchased the relevant goods directly from Federated and May.  Yet the allegations concerning a horizontal agreement between Waterford and Lennox implicate <u>Illinois Brick</u>, as plaintiffs stand as indirect purchasers vis-à-vis this alleged agreement.  Putting aside, for a moment, the alleged vertical agreements, the allegations concerning an agreement between Waterford and Lennox are probative only to the extent they substantiate horizontal agreements between Federated and May or vertical agreements among defendants.  See <u>Arizona v Shamrock Foods</u>, 729 F2d 1208 (9th Cir 1984) (concluding that <u>Illinois Brick</u> is inapplicable to claims against remote sellers when the plaintiffs allege that the sellers conspired with intermediates in the distribution chain to fix the price at which the plaintiffs purchased).  Moreover, if Federated and May succeed in obtaining summary judgment, leaving only an alleged horizontal agreement between Waterford and Lennox, then plaintiffs become indirect

purchasers with respect to the alleged conspiracy and thereby cease
to have standing to sue.


B

The next issue posed by defendants' motions is whether
the alleged agreements among defendants to prevent the sale of
Waterford and Lenox tableware to Bed, Bath and Beyond is properly
viewed as a group boycott deserving of *per se* scrutiny.  Although
the Supreme Court lists "group boycotts" among the classes of
economic activity that warrant *per se* invalidation under § 1, the
Court acknowledges that "exactly what types of activity fall within
the forbidden category is * * * far from certain." Northwest
Wholesale Stationers, Inc v Pacific Stationery & Printing Co, 472
US 284, 294-95 (1985).  See also id at 295 ("There exists more
confusion about the scope and operation of the *per se* rule against
group boycotts than in reference to any other aspect of the *per se*
doctrine.").  Or as one court quipped, using the term "boycott" is
"the equivalent of yelling 'fire' in the halls of traditional
antitrust jurisprudence." Universal Amusements Co v General Cinema
Corp, 635 F Supp 1505, 1523 (SD Tex 1985).

The application of the *per se* rule to group boycotts
developed from a series of cases in which the Supreme Court
invalidated such boycotts as § 1 violations.  In Eastern States
Retail Lumber Dealers' Association v United States, 234 US 600,
611-14 (1914), for example, the Court held unlawful concerted
refusals to deal with wholesalers who sold directly to customers.
Similarly, in Fashion Originators' Guild of America v FTC, 312 US

**United States District Court**
For the Northern District of California

457 (1941), the Court deemed unlawful a joint "program" of textile and garment manufacturers that prohibited the sale of garments to stores that sold "style pirated" garments and the sale of fabrics to manufacturers who sold to stores selling pirated goods.

The Court's predilection for designating group boycotts *per se* unlawful law reached its highwater mark in Klor's Inc v Broadway-Hale Stores, Inc, 359 US 207 (1959).  A retailer, Broadway, entered into an agreement with suppliers of appliances "either not to sell to Klor's or to sell to it only at discriminatory and highly unfavorable prices."  Id at 209. Broadway argued that because consumers and other competitors had access to supply, the public was not injured.  The Court disagreed with Broadway, declaring that

> [g]roup boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category. They have not been saved by allegations that they were reasonable in the specific circumstances, nor by a failure to show that they "fixed or regulated prices, parcelled out or limited production, or brought about a deterioration in quality."

Id at 212 (citing Fashion Ordinators' Guild v Federal Trade Commission, 312 US 457, 466 (1941).

The Supreme Court has since retreated from its stance in Klor's and has cautioned against blindly fixing the *per se* label on all concerted refusals to deal.  See Richard A Posner, Antitrust Law (2d ed 2001) ("A boycott * * * used to be deemed a per se violation * * *; [t]he Supreme Court has wisely abandoned that position, which anyway was never taken seriously").  Indeed, in Northwest Wholesale Stationers, Inc v Pacific Stationery Printing Co, 472 US 284 (1985), the Court rejected, except for a narrow

17

**United States District Court**
For the Northern District of California

category of cases, the *per se* characterization for concerted
refusals to deal.  Under this new standard, the Court declined to
apply the *per se* approach to the expulsion of a member from a
cooperative purchasing agency because the agency achieved
"economies of scale in both the purchase and warehousing of
wholesale supplies."  Northwest Wholesale, 472 US 295.

According to the Northwest Wholesale Court, a *per se*
standard generally applies to cases involving "joint efforts by a
firm or firms to disadvantage competitors by 'either directly
denying or persuading or coercing suppliers or customers to deny
relationships the competitors need in the competitive struggle.'"
Northwest Wholesale, 472 US at 294 (quoting L Sullivan, Law of
Antitrust 261-62 (1977)).  See also P Areeda & L Kaplow, Antitrust
Analysis: Problems, Text, and Cases 333 (5th ed 1997) (defining
paradigmatic boycott as "collective action among a group of
competitors that may inhibit the competitive vitality of rivals").
In these cases, "the boycott often cut off access to a supply,
facility or market necessary to enable the boycotted firm to
compete, and frequently the boycotting firm possessed a dominant
position to the relevant market.  In addition, the practices were
generally not justified by plausible arguments that they were
intended to enhance overall efficiency and make markets more
competitive."  Northwest Wholesale, 472 US at 294.

Guided by Northwest Wholesale, the Court in FTC v Indiana
Federation of Dentists, 476 US 447 (1986), refused to apply the *per
se* designation to an agreement by competitors, dentists, to deny
patient X-rays to insurance companies.  These X-rays posed a
problem for Indiana's dentists because they enabled insurance

companies to review the appropriateness of the dentists' charges. The Court declined to invoke the *per se* rule and "forc[e] the [dentists'] policy into the 'boycott' pigeonhole," reasoning that

> the category of restraints classed as group boycotts is not to be expanded indiscriminately, and the per se approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor.

Id at 458.

A number of courts have construed Northwest Wholesale and Indiana Federation of Dentists as holding that *per se* analysis is inappropriate unless the boycotting party possesses market power or exclusive access to an element in effective competition. See, e g, Hahn v Oregon Physicians' Service, 868 F2d 1022, 1030 (9th Cir 1989). But in FTC v Superior Court Trial Lawyers Association, 493 US 411 (1990), the Supreme Court concluded that at least some group boycotts among horizontal competitors are *per se* unlawful without regard to the market power of the participants. This case involved an agreement by members of a bar association not to represent indigent criminal defendants unless the District of Columbia increased their compensation. The Court held that this agreement "was unquestionably a 'naked restraint' on price and output" and, as such, was *per se* unlawful. Id at 423. See also NYNEX Corp v Discon, Inc, 525 US 128 (1998) (limiting *per se* scrutiny to cases "involving horizontal agreements among direct competitors").

The Ninth Circuit reads Northwest Wholesale and its progeny as establishing three criteria for determining whether the *per se* standard applies to a group boycott:

//

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

(1)   the boycott cuts off access to a supply, facility, or
      market necessary to enable the victim firm to compete;

(2)   the boycotting firm possesses a dominant market position;
      and

(3)   the practices are not justified by plausible arguments
      that they enhanced overall efficiency or competition.

Adaptive Power Solutions, LLC v Hughes Missile Systems Co, 141 F3d
947, 950 (9th Cir 1998) (quoting Hahn v Oregon Physicians' Serv,
868 F2d 1022, 1030 (9th Cir 1988)).   In the Ninth Circuit, these
three criteria "are indicative of *per se* illegal conduct."
Adaptive Power Solutions,  141 F3d at 950.

     Notwithstanding the importance of this court's
determination whether to apply *per se* scrutiny, neither party deals
with this issue adequately.   Defendants misstate the Ninth
Circuit's test and portray these factors as prerequisites for
adopting the *per se* approach.   See Doc #184 at 2 ("horizontal
agreements are eligible for *per se* condemnation only if * * * ").
Plaintiffs relegate their analysis to a footnote, asserting that
(1) the boycott cut off Bed, Bath and Beyond's access to two of the
principal suppliers of high-end tableware (Lenox and Waterford);
(2) the firms instigating the boycott (Federated and May) held
dominant positions in the retail tableware market; and (3) there
are no plausible justifications for the boycott.   Doc #161 at n4.

     With respect to the first factor, the court notes that
Waterford and Lennox were suppliers of tableware products necessary
to enable Bed, Bath & Beyond to compete in the high-end tableware
market.   Further, defendants allegedly cut off this essential
supply in order to obstruct Bed, Bath & Beyond's access to this
market.   The second factor (whether the boycotting firm possesses a

20

United States District Court

For the Northern District of California

"dominant" position in the market) is difficult to assess on the present record.  In 2001, Federated and May were the third and fourth largest department store chains in the United States, respectively.  Doc #181, Ex 35 at 26-27.  Although this ranking among department stores does not imply market power, it may suggest that defendants held a "dominant" position.  As the Seventh Circuit observed in Toys "R" Us, Inc v FTC, 221 F3d 928 (7th Cir 2000), the term "dominant" was "plainly chosen to stand for something different from antitrust's term of art 'monopoly.'"  Id at 936.  In view of this uncertainty, the court finds that this second factor weighs in neither party's favor.

Most damaging to Federated's argument in favor of rule of reason review is the third factor — whether the boycott arguably enhances efficiency or competition.  In accordance with this consideration, courts have noted that in the following factual settings, the effect of a refusal to deal is "more complex" than in the "classic boycott" scenario:  industry self-regulation, sports leagues, health care, noneconomic boycotts and access to joint venture facilities.  ABA Section of Antitrust Law, Antitrust Law Developments, 114 (5th ed 2002).  The conduct alleged by plaintiffs falls within none of these exceptions.  Nor does Federated proffer an independent pro-competitive justification for the alleged horizontal agreements to boycott Bed, Bath and Beyond.  This silence is unsurprising, as the alleged horizontal agreement falls squarely within the ambit of per se treatment as dictated by Northwest Wholesale:  "joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the

21

United States District Court

For the Northern District of California

1   competitors need in the competitive struggle." <u>Northwest</u>

2   <u>Wholesale</u>, 472 US at 294.  Accordingly, the court concludes that

3   the alleged horizontal agreement between Federated and May

4   constitutes a classic boycott and thus warrants *per se* treatment.

5         The court hastens to add that its conclusion does not

6   extend to the alleged vertical agreements to boycott Bed, Bath &

7   Beyond.  The Supreme Court has expressly "limit[ed] the per se rule

8   in the boycott context to cases involving horizontal agreements

9   among direct competitors."  <u>NYNEX Corp v Discon, Inc</u>, 525 US 128,

10  136 (1998).  The vertical agreements therefore warrant *per se*

11  treatment only to the extent they implemented the alleged

12  horizontal agreements — a distinction plaintiffs appear to

13  acknowledge.  See Doc #161 at 9 ("Since, as explained above, the

14  boycott of [Bed, Bath & Beyond] at issue here includes horizontal,

15  as well as vertical, agreements, the *per se* rule applies.").

16        As such, plaintiffs need not define and support a

17  relevant market (as they would need to do for a § 2 claim), nor do

18  they need to demonstrate harm to competition, something which is

19  presumed in a *per se* case, see <u>Fortner Enterprises, Inc v United</u>

20  <u>States Steel Corp</u>, 394 US 495, 498 (1969) ("'[T]here are certain

21  agreements or practices which because of their pernicious effect on

22  competition and lack of any redeeming virtue are conclusively

23  presumed to be unreasonable and therefore illegal without elaborate

24  inquiry as to the precise harm they have caused or the business

25  excuse for their use.'" (quoting <u>Northern Pacific R Co v United</u>

26  <u>States</u>, 356 US 1, 5 (1958))).  But plaintiffs' decision to rely on

27  *per se* scrutiny comes at a cost:  it renders the existence of a

28  horizontal agreement essential to their suit.

United States District Court
For the Northern District of California

        To sum up the court's analysis heretofore, plaintiffs lack standing to rest their case on an agreement between Waterford and Lennox and lack the evidentiary wherewithal to rely alone on the alleged vertical agreements and proceed under the rule of reason.  The upshot is that the alleged agreement between Federated and May is the cornerstone of plaintiffs' legal theory; without it, the case collapses.  With these insights in mind, the court turns to the substance of plaintiffs' suit.

                                    C

        The essential issue propounded by defendants' summary judgment motions is whether plaintiffs adduced enough evidence of concerted action to survive summary judgment.  In Monsanto Co v Spray-Rite Service Corp, 465 US 752 (1984), the Supreme Court announced the modern formula by which courts determine the existence of concerted action:

                The correct standard is that there must be evidence
                that tends to exclude the possibility of
                independent action by the [parties].  That is,
                there must be direct or circumstantial evidence
                that reasonably tends to prove that [the parties]
                had a conspicuous commitment to a common scheme
                designed to achieve an unlawful objective.

465 US at 768.

        Conspiracies may be shown either by direct or circumstantial evidence.  The Court recognizes, however, that "[o]nly rarely will there be direct evidence of an express agreement" in conspiracy cases; hence, circumstantial evidence plays a pivotal role in antitrust litigation.  Although interpreting such evidence and drawing inferences from it ordinarily are responsibilities of the factfinder, the Supreme

                                   23

United States District Court

For the Northern District of California

Court mandates a threshold judicial assessment of such evidence as set forth in <u>Matsushita Electric Industrial Co v Zenith Ratio Corp</u>, 475 US 574 (1986):

> [A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus, * * * conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. * * *  To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. * * * [Plaintiffs], in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [them].

Id at 588 (citations omitted).

Citing its earlier decision in <u>First National Bank v Cities Service Co</u>, 391 US 253, 288-289 (1968), the Court in <u>Matsushita</u> identified two separate inquiries that are relevant to this issue: (1) whether the defendant had "any rational motive" to join the allege conspiracy, and (2) whether the defendant's conduct "was consistent with the defendant's independent interest." <u>Matsushita</u>, 475 US at 596-97.

Animating the <u>Matsushita</u> standard is the Court's concern that "permitting the inference of conspiratorial behavior from circumstantial evidence consistent with both lawful and unlawful conduct would deter pro-competitive conduct — an especially pernicious danger in light of the fact that the very purpose of the antitrust laws is to promote competition." <u>In re Citric Acid Litigation</u>, 191 F3d 1090, 1094 (9th Cir 1999).  See also <u>Matsushita</u>, 475 US at 593 ("Courts should not permit factfinders to infer conspiracies when such inferences are implausible, because

the effect of such practices is often to deter pro-competitive conduct.").

Relying in part on <u>Matsushita</u>, the Ninth Circuit has crafted a two-part test to be applied whenever plaintiffs rest their case entirely on circumstantial evidence. First, defendants may "rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice." <u>In re Citric Acid Litigation</u>, 191 F3d at 1094 (citing <u>Richards v Neilson Freight Lines</u>, 810 F2d 898, 902 (9th Cir 1987). The burden then shifts back to plaintiffs to provide specific evidence tending to show that defendants were not engaging in permissible competitive behavior. See <u>City of Long Beach v Standard Oil Co of California</u>, 872 F2d 1401, 1406 (9th Cir 1989).

The present action implicates this two-part test because plaintiffs have not produced direct evidence in support of their group boycott theory. As noted by the Ninth Circuit, "[d]irect evidence in a [§] 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." <u>In re Citric Acid Litigation</u>, 191 F3d at 1093-94. As plaintiffs appear to concede, none of plaintiffs' evidence satisfies this test, at least with respect to an alleged agreement between Federated and May.

Turning to the Ninth Circuit's two-part test, the court first finds that defendants proffer a "plausible and justifiable reason" for acting as they did. <u>In re Citric Acid Litigation</u>, 191 F3d at 1094. <u>City of Long Beach v Standard Oil Co</u>, 872 F2d 1401, 1406 (9th Cir 1989) (defendant is entitled to summary judgment when it "provides a plausible and justifiable alternative interpretation

United States District Court

For the Northern District of California

of its conduct that rebuts the alleged conspiracy"). Defendants assert that Federated and May were concerned that the sale of its tableware products by Bed, Bath & Beyond would broaden the distribution into a lower prestige channel, a valid and lawful concern. See <u>Winn v Edna Hibel Corp</u>, 858 F2d 1517, 1520 (11th Cir 1988) (recognizing a company's interest in avoiding the "cheapening" of the image of its products); <u>Richards v Neilson Freight Lines</u>, 810 F2d 898, 902 (9th Cir 1987) (finding independent self-interest an adequate explanation).

Prior to 2001, Bed, Bath & Beyond, a national "big-box" retailer of kitchen, bath and other items, was selling various standard tableware products, including, for example, lower-end dinner plates manufactured by Lenox. Doc #131, Ex B, (Johnson depo) at 30:10-12, 37:24-40:2; Doc #141, Ex C (Lundgren depo) at 38:14-21. Bed, Bath & Beyond became interested in expanding its offerings to include more expensive china and crystal manufactured by Lenox, Waterford and others. Doc #131, Ex E (Temares depo) at 35:11-16. Federated and May opposed the broad distribution its manufacturers sought because Federated and May had made significant investments in the sale of Lenox and Waterford products. Doc #141, Ex C at 39:4-40:2, 44:12-45:9. See also <u>Monsanto</u>, 465 US at 763 (complaints by retailers regarding other retailers are "natural – and from the manufacturer's perspective, unavoidable – reactions by distributors to the activities of their rivals").

Consequently, the burden shifts back to plaintiffs to provide specific evidence tending to show that the defendants were not engaging in permissible competitive behavior. See <u>City of Long Beach v Standard Oil Co of California</u>, 872 F2d 1401, 1406 (9th Cir

**United States District Court**
For the Northern District of California

1989).  Such evidence must "tend[] to exclude the possibility that the alleged conspirators acted independently."  <u>Matsushita</u>, 475 US at 588.  In assessing this evidence, the court also considers (1) whether the defendants had "any rational motive" to join the alleged conspiracy, and (2) whether the defendants' conduct "was consistent with the defendant's independent interest."  Id at at 596-97.

The court focuses on the alleged agreement between Federated and May because, as established above, this suit turns on the existence of such an agreement.  Plaintiffs assert that a horizontal agreement may be inferred from the following pieces of information:

> (1) one week after May was advised by Lennox in May 2001 of Lenox's and Waterford's intent to participate in the Bed, Bath & Beyond rollout, Federated contacted both Lenox and Waterford to complain about the rollout;

> (2) both Federated and May used similar language when they separately pressured Lenox and Waterford to break their deal with Bed, Bath & Beyond ("you do what you have to do, and we will do what we have to do") (Doc #180, Ex 10 (Mielke depo) at 136:19-137:17);

> (3) in a letter from Federated's Zimmerman to a Waterford executive, written after Waterford terminated its participation in the rollout, Zimmerman thanked Waterford for doing "the right thing for all partners in the game" (Doc #180, Ex 18); and

> (4) Federated's Zimmerman "took the Fifth" when asked at deposition whether Federated and May entered into any agreements concerning their approach to the Bed, Bath & Beyond rollout (Doc #180, Ex 16 at 48:6-13).

With respect to the first point, defendants note that that plaintiffs offer no evidence that Federated learned of the manufacturers' plans from May.  Federated asserts that it probably learned about the rollout from the manufacturers themselves, as employees from Federated met with the employees of Lenox and

United States District Court

For the Northern District of California

Waterford regularly.  Doc #186, Ex HH, (Gavin depo) at 44:21-45:11, 48:21-49:2, 129:4-8; Ex LL, (McGillivary depo) at 153:9-21.

Defendants also dispute plaintiffs' reasoning concerning the second piece of evidence — the allegation that employees of Federated and May, in separate conversations, used similar language in speaking to the manufacturers about the rollout ("you do what you have to do, and we will do what we have to do").  Doc #161 at 19, 31.  According to defendants, the similarity is unsurprising because the phrase is precisely what retailers should say in order to avoid implicating the antitrust laws.

Third, defendants argue that Federated's letter to Waterford did not refer to May when it thanked Waterford for doing "the right thing for all partners in the game."  In support, defendants claim that Federated and Waterford frequently referred to each other as "partners."  Doc #141, Ex F, ("Grove depo") at 67:14-24, 69:9-13, 84:7.  Federated's expert also used the term "partner" to describe the nature of the relationships between vendors and retailers.  Doc #131, Ex DD at ¶¶ 48, 64, 79.

Regarding plaintiffs' fourth point, defendants cite Curtis v M & S Petroleum, Inc, 174 F3d 661, 675 (5th Cir 1999), for the proposition that the invocation of the Fifth Amendment by Federated's CEO is not sufficient to create a genuine issue of material fact.  Defendants also urge the court to interpret Zimmerman's conduct in light of prior events:  When the New York attorney general's office deposed Zimmerman in 2004, he testified that he could not recall a conversation he had with an executive at Waterford.  In response, the attorney general's office indicted him for perjury.  A New York trial court dismissed the indictment, but

28

the attorney general's office had appealed the dismissal.  As a result, when he was deposed in this action, Zimmerman invoked his Fifth Amendment rights.  Doc #131, Ex X (Zimmerman depo) at 20:20-22:25.

Finally, defendants aver that all witnesses pertinent to this case have denied the existence of any communications between Federated and May regarding Bed, Bath & Beyond.  See Doc #141, Ex C (Lundgren depo) at 75:25-76:7; Ex F (Grove depo) at 88:15-19, 91:10-17; Ex G, (Engelman depo) at 99:19-25; 192:24-193:4; Ex H (Locraft depo) at 181:11-24, 273:20-274:6, 275:1-10; Doc #131, Ex D (Hofer depo) at 158:24-159:2, 214:15-24.  Nor were employees of Bed, Bath & Beyond, Lenox or Waterford aware of any communications between Federated and May.  Doc #131, Ex B (Johnson depo) at 239:12-14; Ex I (Mielke depo) at 158:18-159:6; Ex J (Krangel depo) at 300:14-18; Ex K (Gavin depo) at 255:12-16.

Defendants' methodical critique of plaintiffs' evidence implies that Matsushita demands a certain quantum of evidence of verbal agreement to avoid summary judgment.  Yet the Matsushita court never insisted that any particular kind of evidence of collusion was required.  Instead, the Court demanded that the evidence be of such quality that makes collusion a likely explanation of the activity before the court.  Matsushita's analysis, moreover, arose from the context of a highly improbable twenty-year-long predatory pricing conspiracy; as such, the Court required high-quality evidence to permit such a conspiracy to be presented to a jury.  Matsushita, 475 US at 587-88 ("If the factual context renders respondents' claim implausible - if the claim is one that simply makes no economic sense - respondents must come

forward with more persuasive evidence to support their claim than would otherwise be necessary."). Hence, plaintiffs need not demonstrate the existence of an explicit conspiracy, only that "the inference of conspiracy is reasonable in light of the competing inferences of independent action." Id at 588.

The court therefore assesses whether defendants had "any rational motive" to conspire and whether defendants' conduct was consistent with their independent interest. Matsushita, 475 US at 596-97. Plaintiffs correctly note that Federated and May had a "rational motive" to conspire against Bed, Bath & Beyond. The gravamen of plaintiffs' theory is that Federated and May acted together in an effort to block a new entrant's access to the market. The reasons why such behavior would be economically rational are straightforward. During the alleged conspiracy, consumers were steadily migrating from department stores to home specialty chain stores, such as Bed, Bath & Beyond, and bridal registries (which made up a significant portion of the tableware business) were following suit. Doc #180, Ex 10 (Mielke depo) at 43:25-44:25. Federated and May, as established market participants, could reasonably fear that Bed, Bath & Beyond would erode their profit and market share. As one commentator remarked, "[w]here the 'victim' [of an exclusionary group boycott] is a competitor of the alleged conspirators, there is no mystery as to why the defendants would want to injure the rival. It is axiomatic that firms prefer to have fewer rather than more rivals." Kenneth L Glazer, Concerted Refusals to Deal Under Section 1 of the Sherman Act, 70 Antitrust L J 1, 17 (2002)

//

**United States District Court**
For the Northern District of California

But the motive to conspire articulated by plaintiffs works both ways:  insofar as Bed, Bath & Beyond's competitive threat encouraged conspiracy, it also bolsters defendants' version of the events — that Federated and May pressured the manufacturers unilaterally.  Accordingly, each party's account of the events make "economic sense," see <u>Adaptive Power Solutions, LLC v Hughes Missile Systems Co</u>, 141 F3d 947, 953 (9th Cir 1998), and the emergence of Bed, Bath & Beyond as a competitor does not weigh in either party's favor.

Yet this same economic intuition fails to account for the alleged conspiracy between Lenox and Waterford.  Nothing in the present record establishes an economic motive for a conspiracy between Waterford and Lenox to back out of the Bed, Bath & Beyond rollout.  Nor do plaintiffs articulate why Waterford and Lenox would have harbored animosity toward Bed, Bath & Beyond.  Manufacturers generally lack incentives to conspire to undercut an upstart retailer like Bed, Bath & Beyond; to the contrary, such manufacturers have every reason to establish ties with these newcomers.  This intuition appears to have played out here:  Lennox and Waterford commenced dealings with Bed, Bath & Beyond that were ruptured at the bidding of Federated and May.

In light of plaintiffs' evidence and defendants' market conditions, the issue for the court is to determine whether plaintiffs satisfy their burden and "tend[] to exclude the possibility that the alleged conspirators acted independently." <u>Monsanto</u>, 465 US at 768.  That determination is clear-cut with respect to the alleged horizontal conspiracy between Lennox and Waterford.  As discussed above, the theory that Lennox and

United States District Court

For the Northern District of California

Waterford conspired to boycott Bed, Bath & Beyond neither makes economic sense nor finds support in the record.  See Michael v Intracorp, Inc, 179 F3d 847 (10th Cir 1999) (granting summary judgment in circumstantial evidence case because plaintiffs failed to demonstrate any motive to conspire); Orson, Inc v Miramax Film Corp, 79 F3d 1358, 1370 (3d Cir 1996) (affirming summary judgment for defendant in part because of lack of motive to conspire). Accordingly, the court concludes that plaintiffs' circumstantial evidence of an agreement between Lennox and Waterford falls short of the standard under Matsushita.

Turning to the alleged agreement between Federated and May, the court finds that plaintiffs satisfy their burden, albeit with little evidence to spare.  First, the court agrees with plaintiffs that Federated's and May's simultaneous behavior within a two-week period constitutes a pattern of uniform business conduct that bespeaks a tacit agreement or even so-called "conscious parallelism."  See Petruzzi's IGA Supermarkets v Darling-Deleware Co, 998 F2d 1224, 1242-43 (3d Cir 1993).  To be sure, that Federated learned about the rollout one week after Lenox informed May about the program hardly establishes that Federated communicated with May, as Federated met with its manufacturers on a regular basis.  But defendants fail to explain precisely when or how Federated learned of the rollout from its manufacturers, leaving open the inference of horizontal communications.  See generally Interstate Circuit, Inc v United States, 306 US 208, 225-26 (1939) ("When the proof supported, as we think it did, the inference of such concert, the burden rested on appellants of going forward with the evidence to explain away or contradict it.").

32

United States District Court

For the Northern District of California

1    The parallel language ("you do what you have to do, and
2  we will do what we have to do") used by Federated and May also
3  carries some weight.  Granted, in both situations, business
4  executives plausibly repeated this boilerplate to clarify that each
5  company had to act independently, not collusively.  And it would be
6  anomalous for antitrust law to regard efforts against collusion as
7  evidence of collusion.  But antitrust law does not direct
8  executives to invoke the particular phrase at issue; as such, the
9  striking similarity permits an inference of concerted action.  See
10  e g, <u>De Jong Packing Co v USDA</u>, 618 F2d 1329 (9th Cir 1980)
11  (continuance of conspiracy inferred from identical letters sent
12  separately at the same time); <u>Apex Oil v Di Mauro</u>, 822 F2d 246,
13  255-57 (2d Cir 1987) ("striking" similarity of defendants' separate
14  notebook entries of conversations among them gives rise to
15  reasonable inference of conspiracy).

16    Federated's phrase ("partners in the game") in its letter
17  to Waterford may also suggest a collusive agreement between
18  Federated and May.  That said, if the phrase is construed to
19  encompass May, then Federated's assertion simply offers an opinion
20  that Waterford's exclusive relationship with the various department
21  stores is symbiotic; it does not necessarily imply an agreement
22  between the department stores.  Nevertheless, Federated's alleged
23  acknowledgment of May's interests tends to undercut defendants'
24  contention that they acted independently.  See <u>Petruzzi's IGA</u>
25  <u>Supermarkets</u>, 998 F2d at 1242-43.

26    Finally, Zimmerman's "pleading the Fifth" may be relevant
27  to the present dispute.  In <u>Baxter v Palmigiano</u>, 425 US 308 (1976),
28  the Supreme Court held that the drawing of the adverse inference

from the invocation the Fifth Amendment in civil suit is proper when incriminating evidence is also presented.  See id at 317-18. The Ninth Circuit interprets Baxter as licensing the drawing of an adverse inference in the civil context only if "independent evidence exists of the fact to which the party refuses to answer." Doe by & Through Rudy-Glanzer v Glanzer, 232 F3d 1258, 1264 (9th Cir 2000).  This proviso is said to broker the competing interests of the party asserting the privilege and those of the adverse party, "who is deprived of a source of information that might conceivably be determinative in a search for the truth."  SEC v Graystone Nash, Inc, 25 F3d 187, 190 (3d Cir 1994).  Here, defendants neither contend that corroborating evidence is lacking nor counsel against drawing an adverse inference based on Zimmerman's invocation of the privilege.  This omission impels the court to conclude that Zimmerman's invocation of the Fifth Amendment may have deprived plaintiffs of probative testimony.

In view of plaintiffs' evidence and the market conditions defendants' faced, the court finds that plaintiffs satisfy their burden and tend to exclude the possibility that the Federated and May acted independently.  Accordingly, the court finds that plaintiffs raise an inference of unlawful conspiracy between Federated and May sufficient to overcome defendants' summary judgment motion.

The court stresses that plaintiffs only survive summary judgment on the basis of the alleged horizontal agreement Federated and May:  the vertical communications remain relevant to the extent they abetted the alleged horizontal agreement, but such communications cannot serve as an independent ground for antitrust

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

liability under the rule of reason.  Even if plaintiffs provided evidence under the rule of reason, which they have not, Monsanto and its progeny would require the dismissal of any vertical claims because plaintiffs' evidence suggests, at most, that Lenox and Waterford caved to complaints from Federated and May.  See Monsanto, 465 US at 763, (explaining that distributor complaints "arise in the normal course of business and do not indicate illegal concerted action"); OSC Corp v Apple Computer, Inc, 792 F2d 1464, 1468 (9th Cir 1986) (holding that "[dealer] complaints followed by termination are not enough to provide sufficient proof of an antitrust conspiracy"); The Jeanery, Inc v James Jeans, Inc, 849 F2d 1148 (9th Cir 1998), 849 F2d at 1157 ("Complaints by competitors, standing alone, are not sufficient to show a conspiracy."); Isaksen v Vermont Castings, Inc, 825 F2d 1158, 1162 (7th Cir 1987) (Posner, J) ("Complaints to a supplier, made by competitors of a dealer who is cutting prices below suggested levels are not, standing alone, evidence of agreement").  Hence, even if plaintiffs pursued a claim under the rule of reason, their evidence is insufficient to raise an inference of unlawful conspiracy or combination.

//

//

//

//

//

//

//

//

35

United States District Court

For the Northern District of California

IV

In sum, the court GRANTS Waterford's motion for summary judgment and GRANTS IN PART and DENIES IN PART Federated's and May's motion for summary judgment.  The matter is set down for trial on June 11, 2007.

IT IS SO ORDERED.

_____

VAUGHN R WALKER

United States District Chief Judge