**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   IN RE TABLEWARE ANTITRUST            No    C-04-3514 VRW
     LITIGATION
11   _____/        ORDER

12   THIS DOCUMENT RELATES TO
     ALL ACTIONS
13   _____/

14

15            Plaintiffs in these consolidated cases allege that May

16   Department Stores Co ("May") and Federated Department Stores, Inc

17   ("Federated"), which operate department stores across the United

18   States, and Lenox, Inc ("Lenox") and Waterford Wedgwood, USA

19   ("Waterford"), both of which produce fine tableware sold in the

20   United States, conspired with one another to boycott Bed, Bath and

21   Beyond, a competitor of May and Federated.  Plaintiffs bring suit

22   under § 1 of the Sherman Act, alleging that defendants' conduct is

23   condemned *per se*.  By separate order, the court has denied summary

24   judgment for Federated and May, granted summary judgment for

25   Waterford and set the matter for trial on June 11, 2007.

26            On November 17, 2006, plaintiffs moved for class

27   certification.  Doc #116; Doc #128.  For reasons discussed below,

28   the court CERTIFIES plaintiffs' class pursuant to FRCP 23(b)(3) and

**United States District Court**
For the Northern District of California

1  GRANTS plaintiffs' requuest for appointment of counsel pursuant to

2  FRCP 23(g).

3                                    I

4          Because the court's summary judgment order addressed many

5  of the underlying issues presented here, the court assumes

6  familiarity with that order and the definition of terms therein;

7  the court will confine its discussion in this order to further

8  analysis mandated by FRCP 23.

9          Pursuant to FRCP 23, plaintiffs request certification of

10 the following class:

11

12         All persons who purchased in the United States from
           Federated or May Department Stores Lenox Tableware
           during the period October 1, 2001 through October
13         31, 2003 or Waterford Wedgwood Tableware during the
           period October 1, 2001 through April 30, 2005 (the
14         "Class Period").  Excluded from the Class are all
           employees, officers, directors or agents (including
15         attorneys) of any defendant, as well as any judge,
           justice or judicial officer presiding over this
16         matter, and each such person's immediate family.

17         "Lenox Tableware" includes Lenox, Gorham and Kate
           Spade brand dinnerware (china), crystal stemware,
18         glassware, flatware (sterling and stainless), and
           giftware.
19
           "Waterford Wedgwood Tableware" includes Waterford,
20         Marquis by Waterford, Wedgwood, Vera Wang, Johnson
           Brothers, and Franciscan brand dinnerware (china),
21         crystal stemware, glassware, flatware (sterling and
           stainless), and giftware.
22
           "Federated Department Stores" includes Macy's and
23         Bloomingdale's, Rich's, Lazarus, Goldsmith's,
           Burdine's and the Bon Marche.
24
           "May Department Stores" includes May, Famous-Barr
25         (including L.S. Ayers and The Jones Store),
           Filene's, Foley's, Hecht's, Kaufmann's, Meier &
26         Frank, Robinsons-May and Strawbridge's.

27 Doc #124 at 3-4.

28 //

                                    2

**United States District Court**
For the Northern District of California

1

**A**

2     FRCP 23(a) sets forth the preliminary requirements to

3  certifying a class action:  (1) the class must be so numerous that

4  joinder of all members is impracticable; (2) there must be

5  questions of law or fact common to the class; (3) the claims or

6  defenses of the representative parties must be typical of the

7  claims or defenses of the class and (4) the representative parties

8  must be able fairly and adequately to protect the interests of the

9  class.  FRCP 23(a); see also, e g, <u>Armstrong v Davis</u>, 275 F3d 849,

10  868 (9th Cir 2001); <u>Walters v Reno</u>, 145 F3d 1032, 1045 (9th Cir

11  1998).

12     "In determining the propriety of a class action, the

13  question is not whether the plaintiff or plaintiffs have stated a

14  cause of action or will prevail on the merits, but rather whether

15  the requirements of Rule 23 are met."  <u>Eisen v Carlisle &</u>

16  <u>Jacquelin</u>, 417 US 156, 178 (1974) (quoting <u>Miller v Mackey Intl</u>,

17  452 F 2d 424 (5th Cir 1971)) (internal quotation marks omitted).

18  "A Rule 23 determination is wholly procedural and has nothing to do

19  with whether a plaintiff will ultimately prevail on the substantive

20  merits of its claim."  <u>Little Caesar Enter v Smith</u>, 172 FRD 236,

21  241 (ED Mich 1997).  On a motion for class certification, the court

22  "is bound to take the substantive allegations of the complaint as

23  true."  <u>Blackie v Barrack</u>, 524 F2d 891, 901 n17 (9th Cir 1975).

24  Nonetheless, the court is "at liberty to consider evidence which

25  goes to the requirements of Rule 23 even though the evidence may

26  also relate to the underlying merits of the case."  <u>Hanon v</u>

27  <u>Dataproducts Corp</u>, 976 F 2d 497, 509 (9th Cir 1992).

28  //

United States District Court

For the Northern District of California

1    The court further notes that class actions play a

2  particularly vital role in the private enforcement of antitrust

3  actions.  See Brown v Pro Football Inc, 146 FRD 1, 4 (DDC 1992)

4  ("the framers of Rule 23 seemed to target such cases as this

5  [antitrust action] as appropriate for class determination"); In re

6  Plastic Cutlery Antitrust Litig, 1998 US Dist LEXIS 3628 at *2 (ED

7  Pa 1998)("Class actions are widely-recognized as being particularly

8  appropriate for the litigation of antitrust cases alleging a

9  price-fixing conspiracy * * * "); In re Playmobil Antitrust Litig.,

10  35 F Supp 2d 231, 238 (EDNY 1998) ("antitrust claims are well

11  suited for class actions").  Accordingly, in antitrust cases,

12  courts tend to favor class certification when in doubt.  See

13  Playmobil, 35 F Supp 2d at 239 ("Because of the important role that

14  class actions play in the private enforcement of antitrust actions,

15  courts resolve doubts in favor of certifying the class.");

16  Eisenberg v Gagnon, 766 F2d 770, 785 (3d Cir 1985) ("The interests

17  of justice require that in a doubtful case * * * any error, if

18  there is to be one, should be committed in favor of allowing a

19  class action.").

20    The court first assesses whether the FRCP 23(a)

21  requirements of numerosity, commonality, typicality and adequacy

22  are met.  Under FRCP 23(a)(1), the class be "so numerous that

23  joinder of all members is impracticable."  "A finding of numerosity

24  may be supported by common sense assumptions, and it is especially

25  appropriate in antitrust actions brought under Rule 23(b)(3)."  In

26  re Playmobil Antitrust Litig, 35 F Supp 2d 231, 239 (EDNY 1998)

27  (citing 4 Newberg on Class Actions, § 18-03, n 17 (2d ed 1985)).

28  Plaintiffs estimate that their proposed class "contains thousands

**4**

**United States District Court**
For the Northern District of California

1  of members," Doc #124 at 13, and assert that joinder would be

2  impracticable because class members are geographically dispersed

3  throughout the United States.  The court agrees and finds that the

4  numerosity requirement of Rule 23(a)(1) is satisfied.

5          The court also concludes that the commonality requirement

6  is met.  To satisfy FRCP 23(a)(2), "[t]he existence of shared legal

7  issues with divergent factual predicates is sufficient, as is a

8  common core of salient facts coupled with disparate legal remedies

9  within the class."  Hanlon v Chrysler Corp, 150 F3d 1011, 1019 (9th

10 Cir 1998).  Plaintiff alleges, inter alia, that all class members

11 paid supracompetitive prices for tableware due to defendants'

12 horizontal agreement to boycott Bed, Bath & Beyond in violation of

13 § 1 of the Sherman Act.  Doc #18, ¶¶23-25.  Common issues of law

14 and fact include whether such an agreement existed and, if so,

15 whether it affected the price plaintiffs paid for tableware at

16 defendants' stores.  Accordingly, all class members' claims share

17 these and other common questions of law and fact.

18         Along these lines, the court concludes that the named

19 plaintiffs' claims appear to be typical of the putative class.

20 "The test of typicality is whether other members have the same or

21 similar injury, whether the action is based on conduct which is not

22 unique to the named plaintiffs, and whether other class members

23 have been injured by the same course of conduct."  Hanon, 976 F2d

24 at 508 (internal quotation omitted).  See also Estate of Jim

25 Garrison v Warner Brothers et al, 1996 WL 407849 at *2 (CD Cal

26 1996) ("Typicality in the antitrust context will be established by

27 plaintiffs and all class members alleging the same antitrust

28 violation by the defendants").

**United States District Court**
For the Northern District of California

1    Here, the claims of representatives Young and Galindo and

2  the claims of the class members arise from the same event:  they

3  claim injury from an alleged agreement between Federated and May to

4  boycott Bed, Bath & Beyond via their purchase of tableware at an

5  artificially inflated price.  The fact that named plaintiffs

6  purchased different types of tableware products at different prices

7  from those of the absent class members does not render their claim

8  atypical.  See <u>In re Rubber Chemicals Antitrust Litig</u>, 232 FRD 346,

9  353 (ND Cal 2005) ("That some members of the proposed class may

10  have received discounts * * * such that they did not pay the prices

11  set does not counsel against class certification.").  Nor is it

12  consequential that named plaintiffs did not purchase Lenox

13  tableware; the horizontal nature of the alleged boycott means that

14  named plaintiffs were harmed by the same overarching conspiracy as

15  those in the class who purchased Lenox goods.  See <u>In re Bulk

16  [Extruded] Graphite Prod Antitrust Litig</u>, 2006 WL 891362 at *6 (DNJ

17  2006) (certifying class in which named plaintiffs represented only

18  one particular customer category of three because prices of all

19  categories were allegedly inflated by the same horizontal

20  price-fixing conspiracy).  Accordingly, the court finds that the

21  claims of named plaintiffs are typical of those of the class.

22    Finally, FRCP 23(a)(4) provides that class

23  representatives — both named plaintiffs and their counsel — must

24  "fairly and adequately protect the interests of the class."

25  Legal adequacy turns on two questions: "(1) do named plaintiffs and

26  their counsel have any conflicts of interest with other class

27  members and (2) will the named plaintiffs and their counsel

28  prosecute the action vigorously on behalf of the class?"  <u>Hanlon</u>,

6

United States District Court
For the Northern District of California

1   150 F3d at 1020.

2           Regarding the first inquiry, the court cannot detect —
3   and defendants do not offer — a potential conflict of interest that
4   exists between the representatives and class members.  Members of
5   the class were allegedly overcharged for tableware and have a
6   mutual and coterminous interest in establishing defendants'
7   liability and recovering damages.  Similarly, a review of the
8   litigation heretofore gives the court no reason to doubt that
9   plaintiffs' counsel will act vigorously on behalf of the class.

10          Because class representatives serve as a guardian of the
11  interests of the class, the representatives must have some minimal
12  familiarity with the litigation, see, e g, <u>Burkhalter Travel Agency</u>
13  <u>v MacFarms Int'l, Inc</u>, 141 FRD 144, 153-53 (ND Cal 1991), although
14  a detailed understanding of the theories and facts of the case is
15  not required.  See <u>In re Playmobil Antitrust Litig</u>, 35 F Supp 2d
16  231, 243 (EDNY 1998) (representatives had "an adequate layman's
17  understanding" of the case).  Notwithstanding defendants'
18  nitpicking, both Young and Galindo understand the underlying theory
19  of this case:  that plaintiffs overpaid for tableware due to the
20  exclusion of Bed, Bath & Beyond from the market.  See Doc #206, Ex
21  2 (Galindo depo) at 9:17-10:23, 12:24-14:12; Ex 12 (Young depo) at
22  13:3-7; 14:6-16:10; 38:5-19; 40:21-42:4; 58:2-12.  Accordingly, the
23  court finds that class representatives Young and Galindo — along
24  with their counsel — adequately represent the class.

25          Courts have also read an additional threshold requirement
26  into FRCP 23(a) that does not neatly fall under any of the four
27  listed prerequisites: to certify a class, there must be some
28  evidence that a class exists and that it may be defined with

7

**United States District Court**
For the Northern District of California

1   reasonable specificity.  <u>Simer v Rios</u>, 661 F2d 655, 669 (7th Cir

2   1981); <u>O'Connor v Boeing North American, Inc</u>, 184 FRD 311, 319 (CD

3   Cal 1998); <u>In re Copper Antitrust Litig</u>, 196 FRD 348 (WD Wis 2000)

4   (denying certification in part because plaintiffs could not define

5   the class in a way that would inform copper purchases whether they

6   were in or out of the class).  See also <u>Wagner v Central La</u>

7   <u>Electric Co Inc</u>, 99 FRD 279, 281 (ED La 1983) (the existence of a

8   class is an "implied prerequisite").  A proper class definition is

9   essential because it "identifies the persons (1) entitled to

10  relief, (2) bound by the judgment, and (3) entitled to notice in a

11  Rule 23(b)(3) action."  <u>Gustafson v Polk County, Wis</u>, 226 FRD 601,

12  607 (WD Wis. 2005).

13          The proposed class is not ascertainable, defendants

14  charge, because the definition of "tableware" is too generic and

15  imprecise.  Defendants fault this term for encompassing thousands

16  of items, including "casual" tableware and "giftware," Doc #151 at

17  5-6, 10-11, 13.  The inclusion of so-called casual tableware

18  allegedly raises a host of issues because Bed, Bath & Beyond may

19  have sold this kind of tableware before the boycott in June 2001.

20  Adding giftware to the class definition allegedly renders the case

21  unmanageable because Federated sells two hundred thousand items

22  that it considers to be giftware, approximately 45% of which is

23  manufactured by Waterford and Lenox.  These items include

24  candlesticks, picture frames, vases, bowls, cake stands and

25  utensils.  Doc #154, ¶¶ 7-8.

26          Neither of these inclusions renders the proposed class

27  unascertainable.  A class definition is "definite enough" to

28  satisfy FRCP 23(a)(1) if it "is administratively feasible for the

8

**United States District Court**
For the Northern District of California

1 court to ascertain whether an individual is a member." O'Connor v

2 Boeing North American, Inc, 184 FRD 311, 319 (CD Cal 1998).  Yet

3 defendants' complaint regarding casual tableware does not even

4 concern administrative feasibility; it deals with the provability

5 of damages.  As such, this theory is appropriately presented in a

6 motion for summary judgment or directed verdict, not one for class

7 certification.

8          The inclusion of giftware purchasers in the proposed

9 class gives the court pause due to the sheer number of purchasers

10 it implicates.  But defendants fail to explain why the term

11 giftware is so amorphous that it would preclude the court from

12 ascertaining whether an individual is a member of the proposed

13 class.  The actual dispute — as the court understands it — concerns

14 whether and to what extent giftware falls within the ambit of the

15 alleged boycott; this is a disputed issue better resolved at trial.

16          Neither Mueller v CBS, 200 FRD 227, 233-34 (WD Pa 2001),

17 nor In re Copper Antitrust Litig, 196 FRD 348, 350 (WD Wis 2000)

18 undermines the court's conclusion on this issue.  In Mueller, the

19 plaintiffs sought to certify a class consisting of all of the

20 defendant's former employees over forty years of age who had been

21 terminated in order "to interfere with their benefits."  200 FRD

22 227, 233-34.  The court denied certification, explaining that it

23 would be necessary to hold a series of individualized causation

24 hearings to determine which of the employees had been fired in

25 order to prevent them from receiving retirement benefits.  In In re

26 Copper Antitrust Litig, 196 FRD 348, 350 (WD Wis 2000), the

27 district court denied certification to a proposed class consisting

28 of "all copper or metals dealers * * * that purchased physical

**9**

United States District Court

For the Northern District of California

1   copper" during a specified time period "at prices expressly related

2   to LME or Comex copper future prices."  The court observed that

3   this definition did not "communicat[e] to copper purchasers what

4   they [would] need to know to decide whether they [were] in or

5   outside the proposed class" because plaintiffs failed to explain

6   the meaning of the terms "copper or metals dealers," "physical

7   copper" and "expressly related to."  Id at 358-60.

8          Having reviewed plaintiffs' class definition, the court

9   is satisfied that individuals would be able to determine, simply by

10  reading the definition, whether they are members of the proposed

11  class.  Unlike in Copper Antitrust, none of the terms in the

12  definition requires further clarification.  And unlike the proposed

13  definition in Mueller, plaintiffs' definition would not require the

14  court to hold individualized hearings to decide whether a

15  particular individual fell within the scope of the definition.

16  Accordingly, the court concludes that plaintiffs have proposed an

17  ascertainable class.

18

19                                  B

20         In addition to satisfying the Rule 23(a) prerequisites,

21  the class must also satisfy one of the three alternatives listed

22  under Rule 23(b).  Walters, 145 F3d at 1045.  Plaintiffs bear the

23  burden of demonstrating that they have satisfied all four FRCP

24  23(a) elements and one FRCP 23(b) alternative.  Zinser v Accufix

25  Research Institute, Inc, 253 F3d 1180, 1186 (9th Cir 2001).

26  Failure to carry the burden on any FRCP 23 requirement precludes

27  certifying a class action.  Burkhalter Travel Agency v MacFarms

28  Int'l, Inc, 141 FRD 144, 152 (ND Cal 1991) (Jensen, J) (citing

**United States District Court**
For the Northern District of California

1   <u>Rutledge v Electric Hose & Rubber Co</u>, 511 F2d 668 (9th Cir 1975)).

2          Plaintiffs have opted to proceed under FRCP 23(b)(3),

3   which authorizes the court to certify a class action if "the

4   questions of law or fact common to the members of the class

5   predominate over any questions affecting only individual members,

6   and * * * a class action is superior to other available methods for

7   the fair and efficient adjudication of the controversy."  FRCP

8   23(b)(3).  See also <u>Zinser v Accufix Research Inst, Inc</u>, 253 F3d

9   1180, 1189 (9th Cir 2001).  The matters pertinent to such a finding

10  include:  (a) the interest of members of the class in individually

11  controlling the prosecution or defense of separate actions; (b) the

12  extent and nature of any litigation concerning the controversy

13  already commenced by or against members of the class; (c) the

14  desirability or undesirability of concentrating the litigation of

15  the claims in the particular forum; (d) the difficulties likely to

16  be encountered in the management of a class action.  Id.

17         The objective behind the two requirements of Rule

18  23(b)(3) is the promotion of economy and efficiency.  See FRCP

19  23(b)(3) advisory committee notes.  When common issues predominate,

20  class actions achieve these objectives by minimizing costs and

21  avoiding the confusion that would result from inconsistent

22  outcomes.  Id.

23         To predominate, common questions "need not be dispositive

24  of the litigation."  Rather, the court must identify issues

25  involved in the cases and determine which of them "are subject to

26  generalized proof * * * applicable to the class as a whole" and

27  which must be the subject of proof on behalf of individualized

28  class members.  "Because no precise test can determine whether

United States District Court
For the Northern District of California

1  common issues predominate, the court must pragmatically assess the

2  entire action and the issues involved." Romero v Producers Dairy

3  Foods, Inc, 235 FRD 474, 489 (ED Cal 2006).  Courts in antitrust

4  cases, as in other cases, typically evince a greater willingness to

5  certify classes involving individualized damages, as opposed to

6  individualized liability issues.  See Alexander v QTS Corp, 1999 US

7  Dist LEXIS 11842 (ND Ill 1999).

8        Here, the common questions concern whether defendants

9  agreed to boycott Bed, Bath & Beyond and, if so, whether the

10  boycott affected the price plaintiffs paid for tableware.  See In

11  re Master Key Antitrust Litig, 70 FRD 23 (D Conn 1975) (classes

12  certified in case involving horizontal and vertical communications

13  where "the damage claims arise from the horizontal, not the

14  vertical, conduct and evidence of vertical communications would be

15  offered "only to demonstrate by implication the existence of a

16  horizontal conspiracy").

17        To support the proposed class-wide approach, plaintiffs

18  submit a report from Roger Noll, an economist, who avers that he

19  has identified at least three formulae to measure the class-wide

20  impact of the alleged boycott in this case:  one that compares the

21  list prices for tableware before, during and after the alleged

22  conspiracy; one that analyzes the retail markup over the wholesale

23  cost of tableware; and one that compares similar products that were

24  not part of the collusive agreement. Doc #207, Ex 17 (Noll report)

25  at 7.  Noll concludes that the first approach (so-called "before-

26  and-after") is the most useful here.  Id at 8.

27        A second economist, Paul Liu, performed a regression

28  analysis consistent with Noll's before-and-after approach.  Doc

**United States District Court**
For the Northern District of California

1  **#207, Ex 18 (Liu report) at 8.  To determine impact, Liu**

2  **constructed a mark-up specification model based on transactional**

3  **data produced by defendants that purports to demonstrate a**

4  **statistically significant decline in Lenox, Wedgwoood and Waterford**

5  **tableware markups at Federated and May following the respective**

6  **introductions of such tableware at Bed, Bath & Beyond.  Id, Ex 18**

7  **at 6-8, 13, 14 & Fig 2.  Liu's regression specification shows price**

8  **declines quantified for Lenox (3.84), Wedgwood (2.14) and Waterford**

9  **(6.21) as a percentage of cost relative to the baseline.  Id at**

10  **6-7, 11-16 & Fig 3.  Applying these results to a damage formula**

11  **(difference between "actual" and "but-for" multiplied by total**

12  **cost), Liu estimates that the class suffered damages in the amount**

13  **of $12,301,941 as a result of the boycott.  Id at 15-16.**

14  **Defendants criticize these two expert reports for failing**

15  **to account for individual criteria, such as defendants' store**

16  **locations and their proximity to Bed, Bath & Beyond.  Plaintiffs**

17  **contend that this argument ignores the national structure of the**

18  **tableware market:  Federated and May both adhere strictly to a**

19  **national pricing formula.  Doc #207, Ex 17 at 32.  In view of this**

20  **formula, Noll concludes that "all customers who purchased their**

21  **products were affected identically by any corporate decision that**

22  **affected the distribution and prices of their products," id at 32,**

23  **and that individual damages are not likely to vary substantially**

24  **among products within a line.  Id at 7.**

25  **These submissions suffice to show that means exist for**

26  **proving impact on a class-wide basis, which is all that is required**

27  **under the authority cited by defendants.  The central and common**

28  **element of this suit is whether defendants agreed to boycott Bed,**

United States District Court

For the Northern District of California

1   Bath & Beyond.  See Citric Acid, 1996 WL 655791 at *6 (common

2   questions include whether there was a conspiracy, whether prices

3   were fixed pursuant to the conspiracy, and whether the prices

4   plaintiffs paid were higher than they should have been).  If this

5   element is shown, various exogenous factors may affect the amount

6   of recovery individual plaintiffs may obtain.  But this

7   qualification does not militate against class certification; in few

8   class actions is there a simple per capita measure of recovery.

9   Citric Acid, 1996 WL 655791, at *6 ("Contentions of infinite

10  diversity of product, marketing practices, and pricing have been

11  made in numerous cases and rejected.").  See also In re Brand Name

12  Prescription Drugs Antitrust Litig, 1994 WL 663590 at *4-*5 (ND Ill

13  1994) (class of 50,000 independent retail pharmacists certified to

14  bring claims against thirty-one drug manufacturers involving

15  hundreds of different drugs).  "It is not necessary that plaintiffs

16  show that their expert's methods will work with certainty at this

17  time.  Rather, plaintiffs' burden is to present the court with a

18  likely method for determining class damages."  In re Domestic Air

19  Transp Antitrust Litig, 137 FRD 677, 693 (ND Ga 1991).

20          To be sure, the sheer size of the proposed class will

21  engender management problems, but the advantages of class treatment

22  more than compensate for these administrative costs.  The modest

23  amount at stake for individual plaintiffs in this case renders

24  individual prosecution impractical; class treatment not only

25  promotes judicial economy, it represents plaintiffs only chance for

26  adjudication.  See Amchem Prods v Windsor, 521 US 591, 616 (quoting

27  with approval Advisory Committee's reference to the desirability of

28  a class action when "the amounts at stake for individuals may be so

small that separate suits would be impractical").  Accordingly, the court finds that common questions of law and fact predominate over individual questions and that class treatment of this matter is superior to any other available means of adjudication.

### III

In sum, the court finds that the FRCP 23(a) requirements of numerosity, commonality, typicality and adequacy are met.  The court further finds, pursuant to FRCP 23(b)(3), that common questions of law and fact predominate over individual questions and that class treatment of this matter is superior to any other available means of adjudication.  Finally, the court appoints Saveri & Saveri, Inc; Zelle Hofmann Voelbel Mason & Gette; Furth Lehmann & Grant LLP; The Law Firm of Joseph M Alioto; and The Law Offices of Randy Renick as class counsel.

IT IS SO ORDERED.

VAUGHN R WALKER

United States District Chief Judge