IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TABLEWARE ANTITRUST LITIGATION / | No   C-04-3514 VRW<br><br>ORDER |
| THIS DOCUMENT RELATES TO ALL ACTIONS / | |

     As described in this court's preliminary approval order of April 12, 2007 (Doc #306), plaintiffs in these consolidated cases reached a settlement with one of the defendants, Lenox, Inc. In that order, the court preliminarily approved the proposed settlement, certified the settlement class pursuant to FRCP 23 and approved notice by publication. Notice having been published to the class under the terms of the court's order, see Doc #396, the parties now move for final approval of the proposed settlement (Doc #399 Ex A), and plaintiffs move for final approval of an award of costs and expenses (Doc #394).

The court held a final settlement approval hearing on August 9, 2007. For the reasons that follow, the court GRANTS final approval of the proposed settlement and GRANTS an award of expenses. The court will discuss each of the above issues in turn. Because the court's previous order addressed many of the issues presented here for final approval, the court assumes familiarity with the April 12, 2007, order and the definition of terms therein.

I

On November 12, 2004, plaintiffs filed a consolidated amended complaint alleging that Lenox, Inc ("Lenox") and Waterford Wedgwood, USA ("Waterford"), which produce fine tableware sold in the United States, and May Department Stores Co ("May") and Federated Department Stores, Inc ("Federated"), which operate department stores throughout the United States, conspired with one another to boycott Bed, Bath & Beyond, a competitor of May and Federated. Plaintiffs alleged that after Lenox and Waterford had each decided to sell their products through Bed, Bath & Beyond, Federated and May conspired to pressure Lenox and Waterford into abandoning Bed, Bath & Beyond by threatening to take Lenox and Waterford products off their own shelves. Doc #286 at 2-8. Plaintiffs claimed a per se violation of § 1 of the Sherman Act, asserting that the temporarily successful alleged conspiracy impaired competition in the market for luxury tableware.

In 2006, plaintiffs and Lenox began settlement negotiations, culminating in a settlement agreement on February 22, 2007. Doc #395. The agreement provided for a cash settlement of $500,000, with up to $200,000 set aside for the costs of

administering notice. Doc #300. The remainder, after court-approved attorneys' fees and expenses, was to be distributed either to the settlement class members or to eligible charitable organizations. Doc #300. The court granted preliminary approval of the settlement on April 12, 2007. Doc #306.

Meanwhile, the other defendants elected not to settle. On November 17, 2006, Federated (joined by May) and Waterford moved for summary judgment. Doc ##116, 128. On March 13, 2007, after the plaintiffs had settled with Lenox, the court granted Waterford's motion but denied the motion of Federated and May. Doc #286. The claims against Federated and May proceeded to trial, and on July 2, 2007, the jury returned a verdict in favor of Federated and May. Doc ##389, 390.

On July 19, 2007, the parties moved for final approval of the Lenox settlement. Doc #394. In addition, plaintiffs request that the <u>entire</u> settlement amount be allocated towards litigation costs, specifically expert witness fees, which plaintiffs claim exceed the amount of the settlement fund.

II

The court first addresses the fairness of the settlement, which consists of $500,000 in cash. In making its assessment, the court must adopt the point of view of the class members, who can no longer depend on their attorneys' rigorous adherence to their fiduciary duties. See <u>Court Awarded Attorney Fees</u>, Report of the Third Circuit Task Force, Oct 8, 1985, 108 FRD 237, 255 (1985) ("[T]he court now must monitor the disbursement of the fund and act as a fiduciary for those who are supposed to benefit from it, since

typically no one else is available to perform that function — the defendant has no interest in how the fund is distributed and the plaintiff class members rarely become involved."). This action was brought under the antitrust laws, which provide for an award of fees to a successful plaintiff, but this settlement is not subject to a statutory fee shift; instead, the settlement creates a common fund. As such, the court's obligations are greater as there is an inherent conflict between counsel and their clients who are absent and unrepresented. In a statutory fee shift situation, by contrast, the party from whom fees are extracted is before the court and is able to contest the fee application. Accordingly, the principles of the 1985 Third Circuit Task Force are pertinent here, and the court looks to them for guidance.

In assessing whether a settlement is "fair, reasonable and adequate" under FRCP 23(e)(1)(C), the court is to consider several factors:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement [presumably in comparison to comparable cases]; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of class members to the proposed settlement.

Churchill Village v General Electric, 361 F3d 566, 575 (9th Cir 2004), citing Hanlon v Chrysler Corp, 150 F3d 1011, 1026 (9th Cir 1998). To these factors, the court adds (9) the procedure by which

4

the settlements were arrived at, see <u>Manual for Complex Litigation (Fourth)</u> § 21.6 (2004).

Factor (1) only slightly favors settlement, at least in hindsight: plaintiffs' claim does not appear to be very strong, considering that the other manufacturer defendant won summary judgment and the two retailer defendants prevailed at trial. Especially in an antitrust case, where an agreement must be proven, the success of the other defendants suggests a victory against Lenox would have been unlikely. Although a $500,000 settlement in an antitrust case is not large, the single damages claim in this case is not large, either – only about $12.5 million. Of this, the sale of Lenox products constitutes only about 27 percent, Waterford products constituting the balance. See Doc #183 Ex 69. If, however, plaintiffs had proved their case against Lenox and only Lenox, that defendant would be liable for the full amount of the claimed damages due to joint and several liability under the Sherman Act. Furthermore, the $500,000 settlement probably was less than the expense to Lenox of taking the case to trial. Hence, the settlement is small, Lenox's exposure slight and the settlement amount probably reasonable under the circumstances.

Factor (2) favors settlement because further litigation would entail substantial risk to the class of recovering nothing. In order to win a substantially different result from that obtained against Waterford – which may require counsel to overcome collateral estoppel – any further litigation would likely be complex and expensive and a favorable outcome improbable.

5

Factor (3) does not weigh in favor of settlement because class treatment is generally appropriate in such litigation, and therefore any risk in maintaining the class is low.

The amount of settlement consideration, addressed in factor (4), favors the settlement. The court will not rescribe lead plaintiff's argument on this point, see Doc #394 at 4-7, but does note that in light of the court's order granting summary judgment for a similarly situated defendant, a recovery of half a million dollars appears fair, reasonable and adequate. Moreover, the funds are in cash rather than in vouchers or coupons. On the other hand, as stated, "plaintiffs had estimated single damages in this case at over $12 million, with the majority of those damages being attributable to Waterford products and not Lenox products." Doc #394 at 5. The settlement amount thus appears appropriate.

Within the confines of this litigation, factor (5) also supports settlement. By the time the settlement was reached, the litigation had proceeded to a point in which both plaintiff and defendants "ha[d] a clear view of the strengths and weaknesses of their cases." In re Warner Communications Sec Litig, 618 F Supp 735, 745 (SDNY 1985), aff'd 798 F2d 35 (2d Cir 1986). At the time of settlement, discovery had already concluded, the other defendants including Waterford had already moved for summary judgment and plaintiffs had already filed their opposition to summary judgment. As a result, the true value of the class's claims was well-known.

The views of counsel, factor (6), support settlement. While some courts have indicated that such views are entitled to deference, see, for example, Williams v Vukovich, 720 F2d 909,

6

922-23 (6th Cir 1983), the court is reluctant to put much stock in counsel's pronouncements, given their pecuniary interest in seeing the settlement approved.

Factor (7) does not support settlement, inasmuch as there is no government participant present.

Factor (8) supports settlement because, as of yet, there have been no objectors to the settlement. The response to the notice published in USA Today and online at TheKnot.com and www.TablewareLitigation.com since April 26, 2007, has been positive. The claims administrator has not received any objections or requests for exclusion. See Doc #396.

Finally, the court has previously discussed how factor (9) supports the settlement here. See Doc #306. The extended negotiations that culminated in the settlement indicate that the agreement here was reached in a procedurally sound manner.

For the reasons discussed above and in its April 12 order, the court finds that, on balance, the settlement is fair, reasonable and adequate to the class within the meaning of FRCP 23(e)(1)(C). Accordingly, the court GRANTS the motion for final approval of the settlement.

### III

The settlement amount having been found to be fair, the court turns to class counsel's request for expenses. After the costs of notice have been deducted, $427,072.35 remains in the settlement fund. Doc #416. Plaintiffs have requested that the entirety of that amount be allocated to litigation costs, which plaintiffs assert are $929,337.21. Doc #406. Given plaintiffs'

7

request that <u>none</u> of the settlement amount be distributed to any class members or in a cy pres distribution, the court must examine the fee application with greater scrutiny. The expert fees alone ($630,223.70) surpass the value of the settlement fund.[1] Doc #406 at ¶7.

      The court perceives at the outset two questions that must be addressed: (1) Is the amount of plaintiff's expense request reasonable? and (2) Should counsel obtain the full amount of the settlement – and the class nothing? The answers are, of course, interrelated and may lead to other questions. If, for example, the expense request is inflated by an amount large enough to leave some residue, then should that residue be paid to the class or to class counsel for their efforts? As it turns out, the court believes only the two numbered questions need be answered to dispose of the matter at hand.

### A

      Plaintiffs state that $630,223.70 of the total expenses is attributable to its two expert economists — Professor Roger G Noll and Dr Paul C Liu of The Brattle Group — for their analyses of the tableware market. Doc #406 at ¶7. The two economists each prepared expert reports in 2006, and each gave trial testimony on June 28, 2007. In light of plaintiffs' large expense request, the

---

[1] These expert fees have been paid and there are no outstanding balances, see Doc #406, thereby avoiding the ethical dilemma of compensating expert witnesses on a contingency fee basis. See Cal R Prof Conduct 5-310(B); ABA Model Rule 3.4(b) comment; <u>Von Kesler v Baker</u>, 131 Cal App 654, 658 (1933), cited in <u>Medical Legal Consulting Servs, Inc v Covarrubias</u>, 234 Cal App 3d 80, 92 (1991).

court reviews the contributions of the two expert economists in light of their cost.

Professor Noll drafted a 9-page declaration on April 14, 2006.  Doc #102.  The declaration offered preliminary findings and stated that he required additional sales data in order to complete his report.  Doc #102.  Professor Noll was assisted by Dr Liu and was compensated at $650 per hour.  Doc #102 at 4.

Professor Noll submitted his 39-page expert report on September 8, 2006.  In preparation, he reviewed 71 documents, 15 depositions and legal filings, 7 books and articles, 6 websites, 1 SEC filing and 1 retail industry report.  Doc #183 Ex 67, App B (Noll report).  Professor Noll was assisted by Dr Liu and Avraham Stoler of The Brattle Group, and he was compensated at $650 per hour.  See Noll report at 3.

Paul Liu submitted his own 17-page expert report, also on September 8, 2006.  In preparation, he reviewed 419 documents, 30 depositions and legal documents, 16 CDs and DVDs, 2 websites, 1 article and 1 letter.  Doc #183 Ex 68, App B (Liu report).  He also participated in a number of calls with Federated, May and Bed, Bath and Beyond in April and May 2006.  Liu report at 3.  Dr Liu was assisted by associates at The Brattle Group, and he was compensated at $365 per hour.  Liu report at 2-3.

Dr Liu later submitted a 22-page rebuttal expert report on November 6, 2006, in response to the expert report of Daniel L Rubinfeld.  In preparation, he reviewed 7 additional reports and authorities.  Doc #183 Ex 69.

If the expert economists performed any written analysis not reflected above, the court is unaware of it. In addition, at least Professor Noll was deposed. Doc #160 Ex 11.

Each expert report treats Lenox and Waterford products with roughly equal consideration, not paying materially greater attention to one defendant or the other. In addition, the conclusions in the reports are just as applicable to Federated and May as they are to Lenox and Waterford. Plaintiffs relied on the Noll report in their opposition to summary judgment (see Doc #161 at 15, 19, 24, 37), and both experts testified in the trial against Federated and May (Doc #380).

Without diminishing the work of the distinguished Professor Noll and Dr Liu, a payment of over $630,000 for 87 pages of analysis plus testimony seems, at first blush, on the high side – quite high, as a matter of fact.

Although the expert fees appear rich, they are near counsel's ex ante estimates. Early in this action, on May 2, 2005, class counsel submitted to the court an advance estimate of fees and expenses. Doc #70. There, counsel estimated that expert witness and consultant fees would total $200,000 for discovery and class certification and $300,000 thereafter (including trial), for a total expert fee of $500,000. Doc #70 at 5. For miscellaneous litigation costs, counsel estimated $176,500 for discovery and class certification and $66,000 thereafter, for a total of $242,500. Doc #70 at 5.

Although the final expert bill of $630,000 is twenty-six percent higher than the estimate of $500,000, this underestimate is essentially immaterial here because the estimated amount of expert

10

fees alone consumes the entirety of the Lenox settlement.  A lengthy inquiry into the reasonableness of the Noll report and his charges is simply unnecessary.  The problem before the court would be no different if the Noll and Liu charges came only to $500,000.  (Moreover, and although the court does not know his total charges, the hourly rate of defendants' expert was also quite handsome, indeed).  So a definitive answer to whether the experts' charges are reasonable being not necessary, it suffices to say that they are, in light of the ex ante estimate and the settlement fund, reasonable enough.  And the court can move on to the second, and somewhat more difficult, question.

B

The second question boils down to this:  When a class action recovery is less than the expenses incurred by class counsel in bringing and maintaining the action, should counsel be permitted to retain the entirety of the recovery, or should they be required to distribute at least some of it to the class?

One way to begin a search for the answer is to reframe the inquiry:  What kind of fee and expenses arrangement would the class have struck with class counsel ex ante?  See, for example, In re Wells Fargo Sec Litig, 156 FRD 223, 225-26 (ND Cal 1994).  Such an approach admittedly has its difficulties in a class action "because no member of the class has a sufficient stake to drive a hard — or any — bargain with the lawyer."  Matter of Continental Ill Sec Litig, 962 F2d 566, 572 (7th Cir 1992); see also Goldberger v Integrated Resources, Inc, 209 F3d 43, 53 (2d Cir 2000).  The class here was not consulted in advance, and there is nothing to

11

1 indicate that the representative plaintiffs gave a moment's thought
2 to the possibility of the present situation.  The representative
3 plaintiffs testified at trial and seemed like very nice people, but
4 astute bargainers with lawyers?  No.  They were retail tableware
5 buyers.  Nevertheless, and absent any real help from the
6 representatives, "some guides are available," including "data from
7 large common-pool cases where fees were privately negotiated; and
8 information on class-counsel auctions, where judges have
9 entertained bids from different attorneys seeking the right to
10 represent a class."  In re Synthroid Marketing Litig, 264 F3d 712,
11 719 (7th Cir 2001).

   The results of class counsel competitions are particularly relevant in this regard.  The court thus looks to its own cases in which it has adopted that method, as well as the Federal Judicial Center's 2001 study of competitive bidding procedures.  See Laural L. Hooper & Marie Leary, Auctioning the Role of Class Counsel in Class Action Cases: A Descriptive Study (Aug 29, 2001) [hereinafter "FJC study"], available at http://www.fjc.gov/public/pdf.nsf/lookup/auctioning.pdf/$file/auctioning.pdf (last visited Nov 26, 2007).

   The FJC study discloses a number of provisions relating to expenses and costs that are common to successful bids.  The study compared ten completed auctions whose terms were unsealed and found that seven out of the ten winning bids contained either an explicit cap on expenses or a provision stating that expenses would be included in the attorneys' fee.  See FJC study at 55-58.  Such results are consistent with the court's own practice, and the court has expressed its approval of fee proposals that include expenses.

**12**

See, for example, Wenderhold v Cylink Corp, 189 FRD 570, 573 (ND Cal 1999). Perhaps most relevant for this case, no winning bid in the FJC study stated that expenses might exceed the amount of recovery payable to the class members. In fact, one case suggested the exact opposite: If the recovery amount were under a specific threshold, then the class members would be entitled to one hundred percent of the funds. See In re Auction Houses Antitrust Litig, 197 FRD 71 (SDNY 2000) (Kaplan, J). The FJC study termed that threshold amount the "X-factor." FJC study at 40.

The situation here is one more reason that Judge Kaplan's approach in Auction Houses makes a lot of sense. First, that approach encourages class counsel to economize on expenses in that class counsel must bear all those expenses if the amount recovered fails to achieve the "X-factor;" that risk helps to align class counsel's incentive with that of the class. Second, of course, class counsel still retains an incentive to achieve the greatest recovery possible as they obtain a portion of any recovery greater than the "X-factor."

Although Auction Houses might appear to close the book on the expenses request at issue here, the matter is not so simple. First, it bears repeating that only one out of ten winning bids in the FJC study used an X-factor approach, which demonstrates that it is not a "default" or "favored" method of dealing with expenses. Second, as Judge Kaplan explained in his very thoughtful opinion, the purpose behind the X-factor was to "create a disincentive to cheap, premature settlement." In re Auction Houses, 197 FRD at 83. The Lenox settlement was not premature and, given the probability of a recovery knowing what is now known, not cheap. Finally,

13

despite its attractive features the court did not use the "X-factor" approach nor have occasion to do so here, due to the lack of competition to represent the class. Class counsel did not, therefore, weigh the implications of an "X-factor" approach, and to adopt it at the end, rather than the beginning, of the litigation would be unfair. So the court resorts to a more conventional approach: an effort to replicate what it believes would have obtained in a negotiation between a fully informed and interested class representative and class counsel. And that scenario resembles what would have likely resulted in an individual as opposed to class action.

The situation at bar is not all that uncommon in individual contingent fee litigation: some recovery is obtained but less than the expenses of suit. Under ethical principles, the contingent fee plaintiff remains responsible for the expenses of suit whether he recovers anything or not. See Cal R Prof Conduct 4-210(A)(3); ABA Model Rule 1.5(c); see also ABA Division for Public Education, Legal Fees and Expenses: What are contingent fees?, at http://www.abanet.org/publiced/practical/lawyerfees_contingent.html (last visited Nov 26, 2007). The purpose of the rule is to prevent attorneys from holding an unregulated security interest in the litigation, which is usually prohibited under ABA Model Rule 1.8. On the other hand, financial investment by attorneys – who are officers of the court and are subject to broad regulation and supervision – may be preferable to the cottage industry of private funding companies that advance litigants costs and expenses in exchange for a percentage of the recovery. See Richard S Binko, Association of Trial Lawyers of America, Practical

**14**

<u>Accounting in a Solo or Small Law Office</u>, ATLA Annual Convention Reference Materials Vol 2 (July 2006).

As a practical matter, however, the lawyers' obligation to limit their financial involvement in contingency practice to attorney services is mostly honored in the breach, and contingent fee lawyers generally absorb the expenses incurred in a totally unsuccessful suit. See Gerson H Smoger, Association of Trial Lawyers of America, <u>Funding Contingent Fee Cases: Ethical Considerations</u>, ATLA Annual Convention Reference Materials Vol 2 (July 2004) ("Ultimately, the reality of most modern practices is that there is no expectation of repayment if the case is unsuccessfully prosecuted"). In a partially successful suit, the lawyer may recoup from the recovery the expenses he has advanced to the client; the attorney has acquired a lien on the judgment and can recover the funds advanced for expenses before the client takes his share. See 7 Cal Jur 3d Attys at Law § 220; Cal St Bar Comm on Prof'l Resp & Cond, Formal Op 2006-170.

This result may or may not (probably not) be sound as a policy matter as it encourages (or, more accurately, fails to discourage) wasteful litigation. The court is not, however, writing on a clean slate. The lawyers at bar operate in the world as it is, not as a better world might be, and so must the court. If this were an individual action, not a class action, with the result here, most likely counsel's retention agreement, or a court applying California law in the absence of an agreement, would award counsel the entirety of the Lenox settlement.

This same result here is not unfair simply because this is a class action. After all, the class hardly is losing anything

15

it thought it was entitled to, and there would have been no recovery at all but for the efforts of class counsel.

One could certainly make the argument that class counsel, having burned more candle than generated light, should receive nothing or that counsel should have to share with the class part of this settlement. But one could also argue that notwithstanding the lack of a recovery greater than the expenses of suit, class counsel conferred a benefit on the class in the form of a *possibility* of a recovery; failure of that possibility to materialize does not negate the existence of this benefit and class counsel's entitlement to recover their expenses. One could go on – there may be still other possible ways to look at this situation. Suffice it at this point to observe that making a distribution to the class or a cy pres award would generate additional expenses. This is already a case in which the transactions (and thus social) costs appear to have exceeded the social gain, if any, from the litigation. To force the expenditure of additional costs simply to make what most likely would be a token payment to the class (most of whom would doubtlessly be surprised to receive this manna) or to confer some wholly gratuitous benefit on a cy pres recipient seems pointless. There comes a point at which efforts to achieve equity must stop. In the court's view, we have reached that point.

Counsel's miscellaneous costs of litigation totaling $299,113.51 (for transcripts, travel and the like), see Doc #406, need not be considered because the expert fees subsume the entire settlement fund. For the same reasons, the court need not consider a reasonable attorneys fee.

**16**

The court concludes by noting that there is no significant unfairness here in giving the entire remaining recovery to class counsel. Counsel did not bring a frivolous or dubious lawsuit; the New York Attorney General's investigation more or less invited the suit, and private follow-on litigation is a long accepted practice in antitrust enforcement. Counsel acted responsibly and professionally throughout the litigation. Even accounting for the remaining settlement funds, counsel suffered a substantial loss financially. Although they assumed that risk, it is unlikely that had the class negotiated for the contingency at the outset, a different bargain would have been struck.

V

The court GRANTS the motion for final approval of the settlement and GRANTS an award of expenses in the amount of $427,072.35, plus any interest accrued thereon. Doc ##394, 416.

IT IS SO ORDERED.

                                VAUGHN R WALKER

                                United States District Chief Judge